# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIED MEDICAL ASSOCIATES,<br>    Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY,<br>    Defendants/Counterclaim-Plaintiffs,<br><br>v.<br><br>ALLIED MEDICAL ASSOCIATES, DAVID KIRSTEIN, D.C., and BRYAN EHRLICH, D.C.,<br>    Counterclaim-Defendants. | CIVIL ACTION<br><br>NO. 08-2434 |

## Memorandum

YOHN, J.                                                                                       June 3, 2009

On May 23, 2008, Allied Medical Associates ("Allied") commenced this civil action against State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm"). On February 24, 2009, Allied filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to count I of its complaint. In count I, Allied asserts a claim for payment of medical expenses under the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Con. Stat. §§ 1701 *et seq*. For the reasons that follow, I will deny plaintiff's motion.

## I.      Facts and Procedural Background

State Farm provided automobile liability insurance policies for numerous customers.

These policies contained a provision for payment of first party benefits for medical treatments provided to persons covered under the policies. This case centers on the propriety of the payment requests Allied, a medical provider, submitted to State Farm for medical treatment Allied provided.

In the late 1990s, Allied began working with, and submitting payment requests to, State Farm. (Incollingo Dep. 367:14-16.[1]) Pertinent to this motion, between 2007 and 2008, Allied submitted to State Farm payment requests, in which Allied sought payment for medical treatment allegedly provided to 125 patients. (Compl. ¶ 11; *id.* Ex. 1.) Allied accompanied its requests with HCFA-1500 forms ("Form 1500"),[2] corresponding medical files, and other relevant documentation. (Acornley Dep. 94:7-9, 95:2-7, Jan. 20, 2009.) State Farm received each patient's Form 1500 and each patient's medical file. (*Id.* 94:4-9.) State Farm, however, did not pay Allied. Rather, State Farm launched an investigation into Allied's business and billing practices. (Incollingo Dep. 27:7-8.) Since the investigation began in 2006, State Farm's Special Investigation Unit ("SIU") has shouldered the majority of the investigation into Allied.[3]

### A.   State Farm's Investigation of Allied's Payment Requests

State Farm first became suspicious of Allied when a few policy holders complained to State Farm about telephone solicitations they had received. (Incollingo Dep. 27:7-12, 54:8-9,

---

[1] Mario Incollingo was deposed by Allied on two separate dates: October 15, 2008 and January 19, 2009. The two depositions are consecutively paginated in the record.

[2] HCFA-1500s are Medicare reimbursement forms produced by the Health Care Financing Administration. The form includes information such as the physician's name and qualifications, the diagnosis, and the procedures and services rendered by the physician.

[3] State Farm's SIU is responsible for investigating "suspicious claims that involve potential fraud." (Acornley Dep. 35:24-36:2.)

160:11-12.) The telephone solicitors, who purported to work for insurance companies, the police, or law offices, (*id.* 51:21-52:5, 67:10-17), told the policy holders to seek treatment for injuries sustained in automobile accidents, (*id.* 30:8-11, 150:16-151:10, 181:20-22). Mario Incollingo, a claim representative who works in the SIU and who leads State Farm's investigation of Allied, (Incollingo Aff. ¶ 1), determined Allied was responsible for the phone solicitations.[4] (Acornley Dep. 181:20-22, 517:7-21, 522:2-4.) In light of this determination, Incollingo obtained, beginning in approximately December 2006, the medical files of several of State Farm's policy holders who had been treated at Allied and for whom Allied previously submitted payment requests. (*Id.* 181:12-22; *see id.* 517:7-21 (stating that after learning of the telephonic solicitation he "realized it was Allied that was common to all these solicitations and that's when [he] started to review files").) Incollingo reviewed these files for several months. (*Id.* 190:7-8 (recalling that his review occured "[s]ometime late [20]06 into [20]07 possibly").)

This review elevated Incollingo's suspicions. (*Id.* 187:1-19.) Specifically, Incollingo found that the physician narratives in each file were "template[d]" and "near identical in their form and substance." (*Id.* 186:15-16.) Moreover, the files lacked appropriate documentation, (*id.* 325:20-21), contained "coding" problems, (*id.* 325:14-15), and demonstrated large gaps in time between the date of an automobile accident and the date on which many patients first sought treatment, (*id.* 187:5-14). Incollingo also noted that many of the patient reports were unsigned or signed using "signature stamps." (*Id.* 187:1-4.) In addition to the files, Incollingo reviewed patient testimony. Incollingo discovered discrepancies between the patients' testimony and the

---

[4] Allied's precise role in the telephone solicitation is unclear, although it appears Allied had a business relationship with a marketing company responsible for making the calls. (Lisa Evans Dep., 145:14-22, 148:21-24, 152:18-24, Dec. 18, 2008.)

bills Allied submitted.[5]  (*Id.* 231:15-18.)  After completing this initial review, Incollingo concluded that "documentation in the records indicated to [him] that there was treatment being billed for that wasn't being provided." (*Id.* 321:17-19.)

In approximately March 2007, based on Allied's role in the phone solicitation and on Incollingo's independent review of certain files, (*id.* 236:12-237:20), State Farm hired Detech Investigations to conduct surveillance of Allied's Haverford, Germantown, Frankford Avenue and Bridge Street offices.  (Incollingo Dep. 307:7; Incollingo Aff. ¶ 3.)  The surveillance took place between May 7, 2007 and July 19, 2007.  (Incollingo Aff. ¶ 3.)  After identifying the patients,[6] Incollingo would compare the arrival and departure times seen on the surveillance video with the amount of time for which Allied sought payment.  (Incollingo Dep. 335:19-24.)  For thirty-one patients, Incollingo detected time discrepancies between Allied's payment requests and the surveillance report that suggested to Incollingo that Allied billed State Farm for treatment even if the patient had already departed Allied's facilities.  (*Id.* 338:2-5; Incollingo Aff. ¶ 6.)

Based on the surveillance and Incollingo's review of patient files and past patient testimony, Incollingo suggested to his superiors that State Farm should "hold" its payments to Allied pending the completion of his investigation.[7]  (Incollingo Dep. 258:16-21.)  Brian

---

[5] Incollingo reviewed patient testimony from past depositions and patient statements taken in other matters.  (Incollingo Dep. 231:11-15.)

[6] To identify those persons on the surveillance video, Incollingo compared the surveillance pictures to pictures of the patients taken at the patients' residence.  (*Id.* 245:21-246:3.)  Incollingo also tracked vehicle license plate and vehicle identification numbers to verify his identifications.  (*Id.* 334:5-335:6.)

[7] Though Incollingo recommended that State Farm place anticipated payments to Allied on hold, Incollingo did not recommend that State Farm deny Allied's claims.  (*Id.* 259:18-260-12.)  Rather, Incollingo needed more time to complete a full investigation of Allied.  Specifically,

Acornley, the SIU team leader, testified that on September 24, 2007, State Farm placed a tax identification number block ("TIN block") on Allied.[8] The TIN block stopped all pending and future payments to Allied. (Acornley Dep. 33:11-24, 57:17-18.) Though State Farm did not disclose the imposition of the TIN block to Allied until this litigation, (*id.* 115:23-116:10), beginning in October 2007, State Farm sent letters to Allied (one per patient) informing Allied that State Farm was investigating Allied's payment requests. (*Id.* 108:19-23; 111:1-112:12, 131:1-6 (discussing content of October letter).) This first group of letters did not seek any additional information from Allied to assist State Farm in its investigation. (*Id.* 130:24-131:7.) Indeed, the first letter stated, in material part:

> Please be advised that the above captioned claim is under investigation. As soon as we [State Farm] complete our investigation we will notify you of the outcome and our decision regarding all outstanding medical payments.

(Compl. Ex. 2; *see also* Acornley Dep. 111:11-112:1 (discussing letter).)

After sending this first group of letters, State Farm took two months to develop the "absolutely correct questions" to ask Allied concerning Allied's payment requests. (Acornley Dep. 130:8-131:20.) In December 2007, State Farm sent a second group of letters to Allied (one per patient) that asked Allied to:

1. Identify the physician who performed the initial examination of the patient and prepared the initial report, if it is different from the physician identified as the author of the report.
2. Identify the physician that prescribed/ordered the patient's chiropractic treatment and therapy.

---

Incollingo intended to speak with the policy holders directly and to determine who at Allied provided the alleged treatment. (*Id.* 260:16-21.)

[8] A TIN block is a systemic mechanism that prevents State Farm employees from processing any claims submitted by the blocked party. (Acornley Dep. 33:11-24.)

>    3.   Identify the person(s) administering the therapy and identify if these individuals are licensed professionals.
>    4.   Additionally, if the individuals administering the therapy are licensed professionals, identify the type of license.

(Compl. Ex. 3; *see also* Acornley Dep. 126:5-131:24 (discussing December 2007 letters).) Acornley testified that compliance with its second letter would not result in State Farm automatically honoring the payment request. Rather, according to Acornley, if Allied complied with State Farm's request, State Farm would at least "consider" paying Allied. (Acornley Dep. 98:13-17.)

On March 26, 2008, Allied responded via counsel to State Farm's letters and requested that State Farm honor Allied's payment requests. (Compl. Ex. 4; *see* Acornley Dep. 165:13-166:14 (discussing attorney correspondence).) In the letter, Allied's counsel stressed to State Farm that Allied previously submitted Form 1500s, and that the Form 1500s supplied State Farm with all of the information State Farm needed to process Allied's claims. (Compl. Ex. 4.) SIU claim representative Fred Gerstenfield responded on April 10, 2008. (Compl. Ex. 5; *see* Acornley Dep. 166:15-170:24.) Though unable to provide an explanation as to each patient, Gerstenfield asserted that Allied had yet to provide the information that State Farm requested in the second group of letters sent to Allied. (Compl. Ex. 5.) On April 18, 2008, Allied's counsel sent another letter to State Farm. This letter reiterated that Allied previously provided the requested information. (Compl. Ex. 6.) In addition, Allied's counsel attempted to answer each of the four questions State Farm posed in its second group of letters by citing specific portions of previously submitted documents.[9] (*Id.* at 2-3.)

---

[9] To further answer State Farm's questions, Allied's counsel attached to the letter a spreadsheet that included a column for each patient's name, for the name of the treating

### B. Evidence of Unnecessary Treatment and Fraud

State Farm concedes that it received the Form 1500s and additional information (i.e., patient files) from Allied and Allied's attorneys. (Acornley Dep. 94:7-9, 95:3-7.) State Farm contends, however, that the Form 1500s and corresponding medical documents are "factually inaccurate" because the forms include billing requests for unnecessary medical procedures.[10] (*Id.* 93:8-10.) State Farm supports this contention with expert reports authored by Gerald Malanga, M.D., who authored two reports, and Joseph Verna, D.C., who authored one report. Malanga's first report focused on his review of forty-eight patient files, none of which are at issue in this motion. Malanga's second report focused on those patients for whom Allied seeks payment in count I. (Defs.' Answer to Pl.'s Mot. Summ. J., Ex. A at 5-8.) Malanga found that although patients received many months of physical therapy, Allied did not document the "patient's pain level or functional status in the majority" of the patient notes. (*Id.* at 7.) Malanga also reviewed Dr. Najmi Sheik's electromyography ("EMG")[11] reports. (*Id.*) After review, he opined that Dr. Sheik, a doctor who works part-time at Allied, "continue[s] to demonstrate conclusions of 'positive finding' without accepted and current standards of electrodiagnostic testing." (*Id.*) Moreover, Malanga identified "multiple counts of up-coding," which occurs when a provider

---

physician, and for additional information State Farm requested. (Compl. Ex. 6; *see* Acornley Dep. 174:5-175:2.)

[10] Despite receiving the files, State Farm has not denied the claims, nor has State Farm submitted any of Allied's payment requests to peer review. (Acornley Dep. 227:22-24.) Acornley, who is responsible for lifting the TIN block, surmised that State Farm would take no further action pending the outcome of this case. (*Id.* 342:7-17.)

[11] EMGs assess the health of a patient's muscles, nerves and neuromuscular junctions. *The Merck Manual* 1758 (18th ed. 2006). To perform an EMG, "a needle is inserted in a muscle, and electrical activity is recorded while the muscle is contracting and resting." *Id.*

bills an insurer for procedures or treatment usually performed for injuries more severe than the patient's injuries.  (Malanga Dep. 55:20-22, Feb. 19, 2009.)  In conclusion, Malanga opined that Allied's records demonstrate "a consistent pattern of medical treatment that grossly deviates from the accepted standards of medical care."  (Defs.' Answer to Pl.'s Mot. Summ. J., Ex. A at 8.)

      Verna also reviewed the files at issue in this motion.  (*Id.* Ex. B.)  In these files, Verna discovered "repetitive and interchangeable patterns [that] demonstrate a clear lack of individualized clinical case management and reflect intentional courses of action based on a business model [rather than] individualized clinical attention, individualized clinical decision-making, or individualized medically necessary treatment."  (*Id.* at 6.)  Specifically, Verna identified five primary problems with Allied's payment requests: (1) lack of individualized diagnosis or treatment; (2) misrepresented and unsubstantiated diagnoses; (3) "[n]on-compliance and insufficient documentation of claimed" procedures and services; (4) "[b]illing for medically unnecessary services"; and (5) "[f]ailure to comply with minimum standards of professional performance/practice."  (*Id.* at 7.)  Verna testified that he did not find one appropriate billing request for a chiropractic procedure in any file.  (Verna Dep. 116:9-117:20, Feb. 11, 2009.)  Moreover, Verna did not find a single file where the treatment was appropriate.  (*Id.* 208:12-21.)  Overall, Verna concluded that Allied made decisions based on a business model rather than basing treatment "upon medical necessity, clinical rationale, or individualized patient needs."  (Defs.' Answer to Pl.'s Mot. Summ. J., Ex. B at 13-14.)

      In addition to the expert reports and the surveillance evidence discussed above, State Farm also proffers evidence to support a claim of fraudulent behavior on Allied's part.  Because this evidence and the inferences State Farm urges the court to draw therefrom are not material to

the disposition of this motion, the court need not discuss it at this stage of the litigation.

### C. Procedural History

Since Allied filed its complaint on May 23, 2008, this case has generated many filings in a relatively short period of time, but none dealing with count I of Allied's complaint. As a result, the majority of the procedural history is not essential to the disposition of this motion, and I need not rehearse it here. With respect to the instant motion, Allied moved for summary judgment as to count I on February 24, 2009. State Farm responded on March 13, 2009, and Allied replied to State Farm's response on March 25, 2009. Thus, the issues presented by plaintiff's motion are ripe for review.

## II. Standard of Review

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

"Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d

9

300, 302 n.1 (3d Cir. 1995)). The nonmoving party must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23. In doing so, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not rely merely on bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (quotation marks and citations omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**III.    Discussion**

Count I of Allied's complaint sets forth a claim under the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Con. Stat. §§ 1701 *et seq*. The MVFRL "provides a mandatory program of motor vehicle liability insurance." *Schwartz v. State Farm Ins. Co.*, No. 96-160, 1996 WL 189839, * 2 (E.D. Pa. Apr. 18, 1996). Because the parties

dispute the scope of the MVFRL, the court will detail those provisions relevant to this motion.

### A.     The MVFRL

The MVFRL requires automobile insurance companies to provide insurance coverage "for reasonable and necessary medical treatment and rehabilitative services." § 1712(1); *see Perkins v. State Farm Ins. Co.*, 589 F. Supp. 2d 559, 562 (M.D. Pa. 2008).  Payments for claims within the scope of § 1712(1), that is, payments for reasonable and necessary medical treatment, are "overdue if not [made] within 30 days after the insurer receives reasonable proof of the amount of the benefits. . . . Overdue benefits . . . bear interest at the rate of 12% per annum from the date the benefits become due." § 1716.  Moreover, if the "insurer is found to have acted in an unreasonable manner in refusing to pay the benefits when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee . . . . " *Id.*

The MVFRL also includes a peer review system through which an insurer can challenge the reasonableness and/or necessity of a medical procedure.[12]  *See* § 1797(b)(1)-(3), (5), (7) (collectively setting forth peer review process); *Perkins*, 589 F. Supp. 2d at 562.  The peer review system is not mandatory for either party, and the provider is not required to wait for the conclusion of any peer review request that is made before filing suit.  Where an insurer does not use the peer review system and instead simply refuses payment, a provider can "challenge before a court an insurer's refusal to pay for past or future medical treatment."[13]  § 1797(b)(4).  If the

---

[12] This peer review mechanism was added to the MVFRL in 1990 as part of the Act of February 7, 1990, P.L. 11, no.1990-6 ("Act 6").  Prior to Act 6, the MVFRL did not have a specific mechanism for insurers to evaluate payment requests.  *See Williams v. State Farm Mut. Auto. Ins. Co.*, 763 F. Supp. 121, 125 (E.D. Pa. 1991).

[13] Section 1797(b)(4) provides in full:
A provider of medical treatment or rehabilitative services or merchandise or an

court finds that the "medical treatment or rehabilitative services or merchandise were medically necessary, the insurer must pay to the provider the outstanding amount plus interest at 12%, as well as the costs of the challenge and all attorney fees." § 1797(b)(6).  Further, § 1797(b)(4) authorizes the court to award treble damages if the insurer's conduct is wanton.  Thus, § 1797(b) recognizes two options for insurers that question a provider's claim for benefits: (1) the insurer can submit the claim to peer review, and the peer review organization will analyze the reasonableness and necessity of the provider's care, § 1797(b)(1)-(3), (5), (7); or (2) the insurer can refuse to pay the provider, and in so doing, possibly subject itself to a provider's civil action that challenges the insurer's refusal to pay the provider's claim, § 1797(b)(4), (6).

Importantly, as both discussions above reveal, to recover under either § 1716 or § 1797(b), the care for which the provider seeks recovery must have been, at the least, reasonable and necessary.  Thus, analysis under either provision turns on the same issue.

### B. The Parties' Arguments

The parties rely on different understandings of the MVFRL to support their arguments.  Allied argues that because State Farm has not submitted to peer review the medical files at issue, and because more than thirty days have passed since Allied provided State Farm with "reasonable proof" of the amount of benefits it claimed, Allied is entitled, as a matter of law, to recovery under § 1716.  State Farm focuses its argument on the Act 6 amendments to the MVFRL, contending that Allied's argument, if adopted by the court, would require that State

---

> insured may challenge before a court an insurer's refusal to pay for past or future medical treatment or rehabilitative services or merchandise, the reasonableness or necessity of which the insurer has not challenged before a PRO. Conduct considered to be wanton shall be subject to a payment of treble damages to the injured party.

Farm accept Allied's submissions (i.e., form 1500s and accompanying medical documentation) at face value and ignore the results of State Farm's independent investigation. Notwithstanding the parties' dispute, even under Allied's proposed framework, Allied is not entitled to judgment as a matter of law because a genuine issue of material fact exists as to whether the treatment for which Allied seeks payment was medically reasonable and necessary.[14] Whatever proof has been submitted by Allied and whatever process has been employed by the parties, the MVFRL only requires State Farm to pay for "reasonable and necessary medical treatment." § 1712(1).

---

[14] Though the court rests its holding on § 1716, review of the MVFRL suggests that § 1716 may not provide the recovery Allied seeks. Prior to the Act 6 amendments, insureds invoked § 1716 to recover unpaid benefits. *See Williams*, 763 F. Supp. at 125 (noting that prior to Act 6, an insured could bring a civil action to recover unpaid benefits under § 1716). Since the enactment of Act 6 and the codification of the peer review system for disputed claims, § 1716 applies most readily to situations where an insurer's payment is late, but the obligation to pay is uncontested, whereas § 1797(b) applies most readily to disputed claims. Indeed, in *Schappell, D.C. v. Motorists Mut. Ins. Co.*, the most recent Pennsylvania Supreme Court case to address § 1716, the court held that § 1716 embodies a private cause of action, but held only that the cause of action permitted the recovery of § 1716 interest. 934 A.2d 1184, 1190 (Pa. 2007). In *Schappell*, the insurer paid the outstanding amount due to the medical provider, but did so outside of the thirty day window prescribed in § 1716 and without including the required interest. *Id.* at 1186. Unlike *Schappell*, State Farm has not made or otherwise acknowledged its obligation to make any payment to Allied.

Section 1797(b)(4), added as part of Act 6, appears to address the situation presented in this case. State Farm placed all of Allied claims, both past and future, on "hold," and Acornley, the person in charge of removing the TIN block, (Acornley Dep. 90:6-10), testified that he guessed State Farm would keep the TIN block in place pending the outcome of this litigation, (*id.* 342:7-17). These actions seemingly manifest a "refusal" to pay claimed benefits. *See Webster's Third New Int'l Dictionary* 1910 (1981) (defining "refuse" when used as a verb with the infinitive "to" as follows: "to show or express a positive unwillingness to do or comply with"). Thus, because State Farm appears to have refused payment, § 1797(b)(4) would apply, and under § 1797(b)(6), Allied would recover if a court found that the treatment rendered was medically necessary and reasonable.

Nevertheless, as set forth above, because Allied only raises § 1716 and because the dispositive legal question at this stage of the litigation is the substantially the same under either the § 1716 or § 1797 framework, the court need not further address § 1797(b).

### C. Reasonable and Necessary Medical Treatment

Allied has demonstrated that State Farm received both the Form 1500s and accompanying medical files. (Acornley Dep. 94:7-9, 95:3-7.) Even if the court assumes, *arguendo*, that these submissions would normally constitute reasonable proof of the amount due under § 1716,[15] Allied's argument bypasses the preliminary requirement of § 1712(1). Pursuant to § 1712(1), which defines the scope of coverage the MVFRL requires insurers to offer, an insurer need only pay providers for medical procedures that are reasonable and necessary. *Id.*; *see Perkins*, 589 F. Supp. 2d at 562. Because insurers are not responsible for procedures that are unnecessary or unreasonable, a provider's submission of reasonable proof concerning an unnecessary or unreasonable procedure does not trigger an insurer's obligation to pay a claim under § 1716. Without an obligation to pay, the insurer's failure to pay does not subject the insurer to liability under the MVFRL. Thus, under § 1716, State Farm is not responsible for paying Allied if the procedures and services Allied rendered were unnecessary or unreasonable. *See Tagliati v. Nationwide Ins. Co.*, 720 A.2d 1051, 1056 (Pa. Super. Ct. 1998) (noting that "an insured must demonstrate that the treatment was warranted by the circumstances" to recover benefits under § 1712(1)). Accordingly, disposition of Allied's motion depends on whether Allied has established, as a matter of law, that it provided necessary and reasonable medical treatment and services to the patients for whom it seeks payment.

Turning to the evidence, State Farm proffered two expert reports that address the medical

---

[15] Only if the court finds that the procedures are necessary and reasonable could the court properly entertain the question of whether Allied has submitted reasonable proof of the amount of benefits it claims. As discussed below, a genuine issue of material fact exists as to whether the medical procedures were necessary and reasonable. Thus, the court need not reach the issue of "reasonable proof."

files at issue in count I. Both experts found that Allied's care and documentation of such care deviated from accepted norms in the profession. For instance, Malanga concluded that Allied was guilty of up-coding. (Defs.' Answer to Pl.'s Mot. Summ. J., Ex. A at 7.) In other words, Malanga found that Allied billed State Farm for procedures that were unnecessary based on the injuries afflicting the patient. In addition, Malanga testified that at least some of the numerous deficiencies found in Allied's documentation and treatment were present in all of the files he reviewed. (Malanga Dep. 63:10-24.) Likewise, Verna noted that patterns in the medical documentation demonstrated, *inter alia*, "a clear lack of . . . individualized medically necessary treatment." (Defs.' Answer to Pl.'s Mot. Summ. J., Ex. B at 6.) In fact, according to Verna, not one file included an appropriate chiropractic billing request. (*Id.* 116:9-117:20.) Moreover, Verna testified that the deficiencies in Allied's documentation were not isolated. Rather, Verna found the problems were pervasive, as he did not review a single file where the treatment was appropriate. (*Id.* 208:12-209:9.) Thus, according to Verna's testimony, of the files at issue in count I of Allied's complaint, all include billing requests for unnecessary or unreasonable medical treatments. (*Id.*)

   Viewing the evidence in a light favorable to State Farm, as the court must for purposes of this motion, these deficiencies suggest that Allied provided unnecessary or unreasonable treatment to the 125 patients at issue in count I and then billed State Farm for those treatments. This evidence creates a genuine issue of material fact as to whether the treatment was necessary and reasonable, and, as a consequence, recoverable under the MVFRL. Because a genuine issue of fact exists as to whether Allied's requests are for medically reasonable and necessary treatment under the MVFRL, the court can not find, as a matter of law, that State Farm was

obligated to make payments to Allied and therefore can not hold that State Farm's non-payment violates the MVFRL as a matter of law. Therefore, summary judgment as to count I is inappropriate, and the court will deny Allied's motion accordingly.[16]

An appropriate order follows.

---

[16] Allied also argues that State Farm violated a Pennsylvania insurance regulation that requires insurers to provide a "complete explanation of the calculations made in computing its determination of the amount payable." 31 Pa. Code § 69.43. Because a genuine issue of material fact exists as to the threshold issue of whether State Farm is obliged to pay Allied, this argument is moot.